IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

MICHAEL J. MARINUCCI,

    Appellant/Cross-Appellee,

       v.                    CIVIL NO.: WDQ-11-2517

SG HOMES ASSOCIATES, LP,

    Appellee/Cross-Appellant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Michael J. Marinucci appeals the United States Bankruptcy Court's judgment for SG Homes Associates, LP ("SG Homes") and determination that the judgment debt is not dischargeable.  SG Homes cross-appeals the bankruptcy court's dismissal of its original complaint.  For the following reasons, the bankruptcy court will be affirmed.

I. Background

Marinucci was the president and 50 percent shareholder of Chesapeake Site Contracting, Inc. ("Chesapeake").  Marinucci Test., Trial Tr. 19:12-20:12, July 13, 2011.  On December 20, 2007, Chesapeake responded to SG Homes's request for bids for site work on a building project at Crabbs Branch Way in Montgomery County, Maryland.  Pl.'s Tr. Ex. 2.  Chesapeake's bid

excluded the cost of payment or performance bonds.[1]  *Id.* at 4.

Sometime before December 28, 2007, Marinucci and Jay Munnikhuysen, Cheasapeake's senior project manager, met and discussed Cheasapeake's bid with two SG Homes officials: procurement manager Paul DeVerger, and procurement vice president Lorin Randall.[2]  Pl.'s Ex. 3; Paul DeVerger Test., Trial Tr. 142:7-9, July 13, 2011.  Marinucci asked whether SG Homes would require a bond or accept a higher retainer instead. Pl.'s Ex. 9 at 2; Paul DeVerger Test., Trial Tr. 142:16-18, July 13, 2011.  Although Randall agreed to consider a retainer, SG Homes ultimately required a bond.[3]

On January 28, 2008, SG Homes awarded Chesapeake the contract and requested a certificate of insurance, a performance

---

[1] "A performance bond is generally to protect the beneficiary from a failure to complete the project." Trial Tr. 11:22-23, July 20, 2011.  Should the original contractor fail to finish the project, the bonding company pays the difference between the contract price and the cost to hire a second contractor to complete the work.  *Id.* 11:23-12:3.  A payment bond "ensure[s] that the contractor pays its subcontractors and material men who would otherwise have recourse against the project and could force . . . the developer to pay out for work that had already been reimbursed to the contractor." *Id.* 12:4-9.  "It is a means of protecting the project from liens and double payments." *Id.* 12:9-10.

[2] Randall and DeVerger worked for EYA, LLC, SG Homes's parent company and the construction manager for the Crabbs Branch Way project.  Paul DeVerger Test., Trial Tr. 139:12-19, July 13, 2011; Lorin Randall Test., Trial Tr. 42:13-43:23, July 14, 2011.

[3] Paul DeVerger Test., Trial Tr. 142:20-143:5, July 13, 2011; Lorin Randall Test., Trial Tr. 47:2-16, July 14, 2011.

2

bond, and a completed W-9 tax form.  Pl.'s Ex. 4.  Although the parties had not signed a written contract, work began almost immediately.  Paul DeVerger Test., Trial Tr. 13:1-10, July 14, 2011; Lorin Randall Test., Trial Tr. 76:22-24, July 14, 2011.

On or before February 1, 2008, Marinucci completed a bond request form from Atlantic Risk Management Corporation.  Pl.'s Ex. 12; Michael Marinucci Test., Trial Tr. 64:2-16, 122:15-123:10, July 13, 2011.  The form requested performance and payment bonds.  Pl.'s Ex. 12.  On February 1, 2008, Marinucci told Randall in an email that Chesapeake was "pursuing the performance and payment bonds as we agreed."  Pl.'s Ex. 6 at 3. Marinucci also said that the bonding company needed certain information about SG Homes's parent company before issuing the bonds.  *Id.*  On February 5, 2008, Randall provided the requested information.  *Id.* at 1.

By mid-March 2008, Marinucci had decided not to obtain a bond, because his wife would not sign a personal guaranty as required by bonding companies.[4]  Nonetheless, on March 26, 2008, Munnikhuysen copied Marinucci on an email to DeVerger that said, "Our office advises me that you should see the P&P bond by the end of next week."  Pl.'s Ex. 8.

Work continued without a written contract, and Chesapeake

---

[4] Michael Marinucci Test., Trial Tr. 60:6-9, 61:12-14, July 13, 2011; Pl.'s Ex. 58 at 64:20-66:6 (Michael Marinucci Dep., Nov. 24, 2009).

3

submitted monthly payment applications to SG Homes.  *See* Pl.'s
Ex. 31A.  Each application contained a certification that, "to
the best of [Chesapeake's] knowledge, the work covered by [the]
Application For Payment ha[d] been completed in accordance with
the Contract Documents" and "all amounts previously paid to
[Chesapeake] under the Contract ha[d] been used to pay
[Chesapeake's] costs for labor, materials, and other
obligations."  *Id.* at 1.  Marinucci reviewed each application
and directed an employee to sign it.  Amanda Nethers Test.,
Trial Tr. 74:4-75:2, July 13, 2011.

Chesapeake put the money from SG Homes into a common fund
from which it paid subcontractors and suppliers, including those
who did not provide supplies or services for the Crabbs Branch
Way project.  Martin Schwartz Test., Trial Tr. 91:20-92:1, July
13, 2011; Michael Marinucci Test., Trial Tr. 109:23-110:16, July
13, 2011.

On May 12, 2008, Chesapeake and SG Homes executed a written
agreement (the "Contract") governing the Crabbs Branch Way
project.  Pl.'s Ex. 5 at 1.  The Contract was ambiguous about
whether Chesapeake had to obtain a payment bond.  Lorin Randall
Test., Trial Tr. 52:4-54:23, July 14, 2011.  Subsection G, under
"Payment Conditions," noted that all subcontractors were
"subject to a 5 [percent] retainer and/or must post a bond
guaranteeing satisfactory completion of the work."  *Id.* at 2.

4

An "X" was placed next to both options; thus, the Contract required a five percent retainer and a payment bond.[5] The space for entering the name of the company issuing the bond was left blank. *Id.*

Subsection M ("Performance and Payment Bonds"), under "General Conditions," also had two provisions. Pl.'s Ex. 5 at 6. Part (a) stated that Chesapeake would pay for and provide SG Homes performance and payment bonds, unless a "box [was] checked and no bond [was] indicated above." *Id.* There was neither a box nor a check next to this provision. Part (b) stated that, if Chesapeake was not required to have bonds, SG Homes could require a bond "at any time," at SG Homes's expense. *Id.* Attachment C to the Contract excluded from the scope of work the cost of payment and performance bonds. Pl.'s Ex. 5, Attachment C at 4.

The Contract also governed payment of Chesapeake's subcontractors and suppliers. Subsection L, under "Payment Conditions," required Chesapeake to "insure that all subcontractors, employees, and suppliers, at all times [were] paid all amounts due in connection with the performance of this

---

[5] *Id.* Although the provision referred to a "warranty/completion" bond, an attached sample bond protected SG Homes against Chesapeake's default "in the performance of its obligations under the Contract." *See* Pl.'s Ex. 5, Schedule E. Those obligations included paying subcontractors and suppliers and keeping the project free of liens, as discussed *infra*.

5

Contract," and submit evidence of payments. Pl.'s Ex. 5 at 2. Subsection H, under "General Conditions," required Chesapeake to keep the project free of liens. *Id.* at 5.

Marinucci understood that SG Homes wanted the subcontractors and suppliers on the Crabbs Branch Way project to be paid. *See* Michael Marinucci Test., Trial Tr. 101:22-102:20, July 13, 2011. He also understood that the Contract required Chesapeake to use the money from SG Homes to pay subcontractors working on the project. *See id.* at 128:12-23. Chesapeake's contracts with the subcontractors and suppliers provided that Chesapeake would pay them when it was paid by SG Homes. *See id.* at 103:3-106:1. In addition, Marinucci knew about the Maryland Construction Trust Statute, which requires money given to a contractor by a project's developer to be used only to pay that project's subcontractors. *Id.* at 43:2-10; Md. Code Ann., Real Prop. § 9-201.

On May 14, 2008, Munnikhuysen sent an email to DeVerger to say that Chesapeake's bond[6] had been "cancelled because [Chesapeake] assumed that [SG Homes] no longer wanted it." Pl.'s Ex. 9 at 2. Munnikhuysen noted that the original proposal and Attachment C to the Contract excluded bonds from the scope of work, and the contract price was not increased for the cost

---

[6] Munnikhuysen did not specify whether he meant a performance bond, a payment bond, or a bond that insured performance and payment.

6

of a bond.  *Id*.

DeVerger responded the same day, noting that "there may
have been a communication breakdown" because SG Homes still
needed a bond.[7]  Pl.'s Ex. 9 at 1.  DeVerger asked how soon
Chesapeake could obtain a bond, and at what cost, so that the
Contract could be revised.  *Id*.  About 20 minutes later,
Munnikhuysen replied that he had "talked to [Marinucci] via
telephone and [Chesapeake] [would] get the bond right away."
Pl.'s Ex. 9 at 1.  Marinucci was copied on every email in the
exchange.  *Id*. at 1-2.

On June 3, 2008, DeVerger emailed Munnikhuysen and asked
when the bond would be issued.  Pl.'s Ex. 10.  Munnikhuysen
responded that he would "check again" and "let [DeVerger] know."
*Id*.  Munnikhuysen copied Marinucci on the email.  *Id*.

On June 17, 2008, Munnikhuysen sent DeVerger -- and copied
Marinucci on -- an email with the subject line "Guardrail/bond -
Crabbs Branch Way."  Pl.'s Ex. 11.  Munnikhuysen said that he
had received DeVerger's telephone message and forwarded it to
Marinucci, who was out of the office but "handling the issues
[DeVerger] [had] called about."  *Id*.

On September 10, 2008, Randall emailed Marinucci to say
that a subcontractor had told SG Homes that it had performed
work for Chesapeake in July 2008 but would not be paid until

---

[7] DeVerger also did not specify the type of bond needed.

October 2008.  Pl's. Ex. 13.   Randall told Marinucci that he would "pay them directly and back the amount out of [Chesapeake's] next payment."  *Id.*

On October 9, 2008, Randall emailed Marinucci about another subcontractor that was owed money from Chesapeake.  Pl's. Ex. 16.  Marinucci responded that the subcontractor should be paid with a "joint check."  *Id.*

On October 29, 2008, Randall emailed Marinucci to say that other subcontractors and suppliers had reported that they had not been paid by Chesapeake.  Pl's. Ex. 15.  Randall said that SG Homes would pay them directly "with funds due Chesapeake." *Id.*  But after the suppliers and subcontractors were paid, SG Homes's "preliminary calculations" indicated that "no money [would] be due Chesapeake."  *Id.*  SG Homes terminated the Contract.  *Id.*

On February 13, 2009, SG Homes sued Chesapeake and Marinucci in the Circuit Court for Montgomery County (the "circuit court") for breach of contract, fraud, and violation of the Maryland Construction Trust Statute.  ECF No. 20, Ex. 2.

On January 20, 2010, Marinucci filed for Chapter 7 bankruptcy protection in the bankruptcy court.  Bankruptcy Petition No. 10-11253 [hereinafter "Chapter 7 Case"], ECF No. 1. The circuit court stayed SG Homes's suit against Marinucci, pursuant to 11 U.S.C. § 362.  ECF No. 20, Ex. 2 at 9 (Docket No.

8

47).  On January 21, 2010, the circuit court entered an order of
default against Chesapeake as a discovery sanction.  ECF No. 20,
Ex. 2 at 8 (Docket No. 45); ECF No. 20, Ex. 1 at 5:17-23.

On April 19, 2010, trial proceeded in the circuit court on
SG Homes's damages against Chesapeake.  ECF No. 20, Ex. 1 at
5:17-6:1.  The following exchange took place:

> Court: You are requesting that I make findings and
> enter a judgment as to Count 1 of the amended
> complaint, breach of contract?
>
> Counsel: Correct.
>
> Court: If I do that, do you need to proceed on the
> remaining counts?
>
> Counsel: Well, the fraud is, essentially, the same as
> the -- the damages are essentially the same as the
> breach of contract in this case.
>
> Court: So, you would dismiss the remaining counts?
>
> (Discussion off the record.)
>
> Counsel: We will dismiss the fraud case, Your Honor[.]

Id. 20:8-21.  The circuit court ruled that Chesapeake had
breached its contract, dismissed the remaining counts
against Chesapeake, and entered judgment of $208,806.89 for
SG Homes.  Id. 21:14-22:3.  The circuit court warned that
the judgment was not final, because SG Homes had not
voluntarily dismissed the claims against Marinucci.  Id. at
22:5-25.

On April 23, 2010, SG Homes filed an adversary proceeding

9

against Marinucci in the bankruptcy court, seeking a declaration that Marinucci's debt was nondischargeable because he had "defalcated[8] in his fiduciary duties and capacity as a trustee." Adversary Proceeding No. 10-00252 [hereinafter "Adversary Case"], ECF No. 1 at ¶ 15.  SG Homes alleged that Chesapeake had held money in trust for subcontractors, Marinucci had controlled the money, and he had knowingly withheld it from the subcontractors, in violation of the Maryland Construction Trust Statute.  *Id.* ¶¶ 13-15.  SG Homes sought to recover $208,806.89, plus fees and costs.  *Id.* ¶ 16.

On July 14, 2010, Marinucci moved for judgment on the pleadings.  Adversary Case, ECF No. 7.  He argued that a violation of the Maryland Construction Trust Statute was not a valid basis for objecting to the discharge of his debt.  *Id.*, Mem. in Supp. of Mot. for J. on the Pleadings at 3-8.

On July 28, 2010, SG Homes opposed the motion and moved to amend the complaint.  *Id.*, ECF Nos. 13, 14.  SG Homes argued that the law was unsettled about whether a violation of the Maryland Construction Trust Statute could be the basis for non-dischargeability.  *Id.*, ECF No. 13 at 3-9.  SG Homes also moved to amend the complaint to add two claims.  *Id.*, ECF No. 14.

---

[8] "Defalcation is the failure to meet an obligation or a nonfraudulent default."  *Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001) (internal citation and quotation marks omitted).

Proposed Count 2 asserted that Marinucci had committed fraud by misrepresenting Chesapeake's financial condition and its efforts to obtain a bond, and instructing Chesapeake staff to submit false invoices to SG Homes. *Id.*, ECF No. 14-15 at ¶¶ 83-90. Proposed Count 3 was a subrogation claim, asserting fraud on behalf of subcontractors, vendors, and suppliers that were not paid by Chesapeake. *Id.* ¶¶ 91-104.

On September 21, 2010, the bankruptcy court granted Marinucci's motion for judgment on the sole count of the original complaint (violation of the Maryland Construction Trust Statute). Adversary Case, ECF Nos. 22, 23. The court also granted SG Homes's motion to amend the complaint to add the fraud count, but denied the motion to add the proposed subrogation claim. *Id.*, ECF Nos. 22, 24.

On July 13, 2011, trial began on the fraud claim. Marinucci immediately moved for summary judgment on the basis of collateral estoppel. Trial Tr. 5:15-9:2, July 13, 2011. Marinucci argued that, because SG Homes had dismissed its fraud count against Chesapeake in the circuit court, it was barred from pursuing its derivative fraud claim against him in bankruptcy court. *Id.* The bankruptcy court rejected Marinucci's argument, reasoning that the amended complaint alleged that Marinucci himself had made misrepresentations, and liability did not require a finding that Chesapeake had also

11

committed fraud.  Trial Tr. 12:22-13:5, July 13, 2011.

SG Homes proceeded on two theories of fraud.  First, it
asserted that Marinucci had falsely represented that Chesapeake
would obtain a payment bond.  Trial Tr. 9:21-24, July 20, 2011.
Second, it alleged that Marinucci had falsely certified in the
monthly payment applications that Chesapeake was paying its
suppliers and subcontractors.  *Id.* 10:3-9.

At trial, the parties stipulated that SG Homes had paid
$208,806.89 to the subcontractors and suppliers that had worked
on the Crabbs Branch Way project and not been paid by
Chesapeake.  Trial Tr. 131:12-132:20, July 13, 2011.  Randall
testified that none of the money came from funds owed
Chesapeake, and he explained how he calculated the figure using
invoices, balance sheets, and Chesapeake's payment applications.
Lorin Randall Test., Trial Tr. 115:15-119:22, July 14, 2011.  He
also testified that, had he known in January or February 2008
that Chesapeake would not obtain a bond, SG Homes would not have
awarded the contract to Chesapeake or allowed it to start work.
*Id.* at 61:15-24.  He testified that, had he known after
executing the Contract that Chesapeake would not obtain a bond,
SG Homes would have paid the subcontractors and suppliers
directly, or worked out an agreement with Chesapeake to issue
joint checks.  *Id.* at 57:4-18.

Marinucci testified that when SG Homes paid the

12

subcontractors and suppliers, it owed Chesapeake $277,000. Michael Marinucci Test., Trial Tr. 122:12-21, July 14, 2011.  He presented no supporting exhibits, however, and conceded during cross examination that he had not reviewed the invoices used in Randall's calculations.  *Id.* at 125:15-126:2.  A spreadsheet of unpaid bills, created by Chesapeake, showed that the company owed $534,543.80 to vendors in November 2008.  Pl.'s Ex. 52 at 3.  The court also heard portions of Marinucci's depositions, in which he had testified that he had not tried to secure a bond for the project.  *See* Michael Marinucci Test., Trial Tr. 43:11-44:1, July 13, 2011.

The court found that the parties had agreed that Chesapeake would obtain a bond that insured payment.  Trial Tr. 13:5-10, 19:15-18.  The court also found that Marinucci had misrepresented Chesapeake's intent to obtain the bond.  *Id.* 13:5-20:16.  Specifically, the court found that:

- Marinucci had completed -- but never submitted -- a bond request form seeking performance and payment bonds. Although Marinucci took "an initial look at whether a bond might be available," he decided not to obtain it after learning it would require a personal guaranty.  *Id.* at 16:17-17:1, 17:11-23, 18:18-22.

- The "P&P bond" in Munnikhuysen's March 26, 2008 email to Randall meant "payment and performance bond."  *Id.* 13:5-14.

13

By then, Marinucci had decided not to obtain a bond.
Marinucci was copied on the email, understood that
Munnikhuysen was promising a performance and payment bond
the next week, and breached his duty to SG Homes to correct
this false statement.  *Id.* at 13:15-14:1, 18:13-17.

- The May 14, 2008 email that Munnikhuysen sent to DeVerger -
  - and copied to Marinucci -- was "intentionally
  misleading."  The email said that Chesapeake's bond had
  been canceled, but the company had never acquired a bond.
  *Id.* at 14:2-17.

- The June 3, 2008 email that Munnikhuysen sent to DeVerger -
  - and copied to Marinucci -- was misleading, because it
  implied that Chesapeake was still in the process of
  obtaining a bond.  *Id.* at 14:18-25.

- The June 17, 2008 email that Munnikhuysen sent to DeVerger
  -- and copied to Marinucci -- was misleading because it
  implied that there was a bond "to check on."  *Id.* at 15:21-
  25.

The bankruptcy court also found that Marinucci had lied in
the certifications in the monthly payment applications, because
Chesapeake had not used the money from SG Homes to pay only
subcontractors and suppliers connected to the Crabbs Branch Way
project.  Trial Tr. 20:17-23:8, July 20, 2011.

The bankruptcy court found that damages were $208,806.69 --

14

the amount SG Homes had "double paid" for the suppliers and

subcontractors.  Trial Tr. 25:16-19, July 20, 2011.  The court

rejected Marinucci's argument that it should reduce the damages

by the amount SG Homes owed Chesapeake for services already

provided.  *Id.* at 24:18-25:2.  Crediting SG Homes's evidence

over Marinucci's "unsupported testimony," the court found that

"there was an ultimate deficit on this job" after SG Homes paid

the suppliers and subcontractors.  *Id.* 25:3-15.

The court further found that the judgment debt was not

dischargeable, because Marinucci had drawn a $150,000 salary

from Chesapeake and

> [w]ithout revenue[,] the company would fail, [and]
> when the company failed[,] the salary would stop.
> When the company . . . fail[ed,] the investment, the
> 50 percent ownership interest, would go from whatever
> value it may have had to zero[.]

Trial Tr. 29:12-30:11, July 20, 2011.

On September 7, 2011, Marinucci filed his notice of appeal.

ECF No. 1.  On October 13, 2011, SG Homes filed its notice of

cross-appeal.  ECF No. 12.

II. Analysis

  A. Standard of Review

The Court reviews the bankruptcy court's findings of facts

for clear error and conclusions of law *de novo*.  *See Duncan v.*

*Duncan (In re Duncan)*, 448 F.3d 725, 728 (4th Cir. 2006).  "A

finding of fact is clearly erroneous when, although there is

evidence to support it, the reviewing court on the entire
evidence is left with the definite and firm conviction that a
mistake has been committed."[9]  "A reviewing court will not
reverse simply because it is convinced that it would have
decided the case differently."[10]

B. Marinucci's Appeal

Marinucci argues that the adversary proceeding should have
been dismissed because the circuit court judgment collaterally
estopped SG Homes from suing him in bankruptcy court.  ECF No. 3
at 9-16.  He argues alternatively that the bankruptcy court
erred in awarding SG Homes a non-dischargeable judgment because
SG Homes failed to establish fraud.  *Id.* at 16-40.

1. Collateral Estoppel

The doctrine of collateral estoppel bars "successive
litigation of an issue . . . actually litigated and resolved in
a valid court determination essential to the prior judgment."
*Taylor v. Strugell*, 553 U.S. 880, 892 & n.5 (2008) (internal
quotation marks omitted).  To determine whether the circuit
court judgment against Chesapeake collaterally estopped the
federal bankruptcy litigation against Marinucci, the Court

---

[9] *Montgomery County v. Barwood, Inc.*, 422 B.R. 40, 44 (*citing
Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (internal
quotation marks omitted)).

[10] *Citizens Bank of Md. v. Broyles (In re Broyles)*, 55 F.3d 980,
983 (4th Cir. 1995) (*citing Anderson*, 470 U.S. at 573) (internal
quotation marks omitted).

applies the collateral estoppel law of Maryland. *See In re Duncan*, 448 F.3d at 728.

In Maryland, collateral estoppel bars relitigation of an issue when: (1) the issue in the present dispute is identical to that decided in an earlier dispute; (2) there was a final judgment on the merits in the earlier proceeding; (3) the party against whom collateral estoppel is asserted was a party or in privity with a party to the earlier proceeding; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to be heard on the issue. *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 761 A.2d 899, 910 (Md. 2000).

Marinucci argues that collateral estoppel barred the adversary action because SG Homes sought to hold him liable, as a corporate officer, for Chesapeake's torts. ECF No. 3 at 10. He contends that SG Homes was barred from claiming in bankruptcy court that Chesapeake had committed fraud, because it waived that claim when it dismissed it in the circuit court.[11]  He

---

[11] *Id.* at 10.  To the extent that Marinucci argues that waiver is a separate ground for reversing the bankruptcy court, *see* ECF No. 3 at 11, the argument fails on its merits.  "Waiver is the intentional relinquishment of a known right . . ." *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Centre at Parole, LLC*, 25 A.3d 967, 983 (Md. 2011).  In Maryland, a plaintiff "may proceed against any one of several joint tortfeasors regardless of the others." *Gordon v. Opalecky*, 137 A. 299, 304 (Md. 1927) (*cited in Cooper v. Bikle*, 640 A.2d 1120, 1125 (Md. 1994)).  Thus, SG Homes did not waive its right to pursue a fraud claim against Marinucci when it dismissed its fraud claim against Chesapeake.

argues that "without a corporate tort, there can be no liability
of the officer." *Id.* at 10.

SG Homes counters that collateral estoppel does not apply
to a voluntary dismissal without prejudice, and Marinucci waived
the defense of collateral estoppel by not pleading it in his
answer.  ECF No. 20 at 14-20.

Although Marinucci waived this argument by not raising it
in his answer,[12] the bankruptcy court did not err in denying
Marinucci's motion for summary judgment on the merits.  First,
there was no final judgment in the circuit court.  *See* ECF No.
20, Ex. 1 at 22:5-25.  After receiving judgment on its breach of
contract claim, SG Homes voluntarily dismissed the fraud claim
against Chesapeake.  *Id.* at 20:8-21.  But it did not dismiss the
claims against Marinucci.  *Id.* at 22:5-25.  Because the circuit
court order did not adjudicate all pending claims, it was not a
final judgment, and collateral estoppel did not apply.[13]

---

Moreover, Marinucci waived this affirmative defense by not
raising it in his answer.  *See infra* note 12.

[12] "Ordinarily, under the Bankruptcy Rules as under the Civil
Rules, a defense is lost if it is not included in the answer or
amended answer."  *Kontrick v. Ryan*, 540 U.S. 443, 459-60 (2004).
*See also* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a
party must affirmatively state any . . . affirmative defense,
including . . . estoppel . . . and waiver.");  Fed. R. Bankr. P.
7008 (Fed. R. Civ. P. 8 applies in adversary proceedings).

[13] *See* Md. R. 2-602(a) (a court order "adjudicating fewer than
all of the claims in an action . . . is not a final judgment").

18

Second, the fraud claim against Chesapeake was not
"actually litigated" in the circuit court, so there was no
judgment on the merits.[14]  "What matters for purposes of
collateral estoppel is not that a suit or a cause of action has
been dismissed," but that "an issue of ultimate fact has once
been determined."  *Puller*, 899 A.2d at 893 (internal citation
omitted).  A voluntary dismissal may "not remotely entail any
actual litigation of factual issues."  *See id.* at 898-99.
Because SG Homes dismissed the fraud claim, those allegations
were not litigated on the merits, and collateral estoppel did
not apply.[15]  The bankruptcy court did not err in denying
Marinucci's oral motion for summary judgment.

   2. Proof of Fraud

   Marinucci argues alternatively that the bankruptcy court

---

In addition, SG Homes did not expressly move to dismiss the
fraud claim against Chesapeake with prejudice, so the dismissal
did not bar SG Homes from relitigating that claim.  *See* Md. R.
2-506(c) ("Unless otherwise specified . . . , a dismissal is
without prejudice[.]").

[14] *See Piercy v. Piercy (In re Piercy)*, 140 B.R. 108, 113 (D. Md.
1992) ("The doctrine of collateral estoppel . . . [is]
applicable to dischargeability claims . . . . when the facts and
issues have been actually litigated by the state court and were
necessary to the state court decision."); *John Crane, Inc. v.
Puller*, 899 A.2d 879, 893 (Md. Ct. Spec. App. 2006) ("the *sine
qua non* is that the factual issue was actually litigated on its
merits in the earlier case").

[15] *See Puller*, 899 A.2d at 899 (collateral estoppel did not apply
when plaintiff voluntarily dismissed claim and "no issue of fact
was ever litigated").

erred by entering a non-dischargeable judgment against him, because SG Homes failed to prove two elements of fraud: reliance and damages.  ECF No. 3 at 16-40.

Absent a statutory exception, a debtor's obligations are discharged after Chapter 7 bankruptcy proceedings.  *See* 11 U.S.C. § 523(a) (identifying 19 statutory exceptions to discharge).  SG Homes objected to the discharge of Marinucci's debt under 11 U.S.C. § 523(a)(2), which disallows the discharge of a debt obtained by fraud.

> a. Reliance

To establish fraud, a plaintiff must show, *inter alia*, that it actually relied on the debtor's misrepresentations, and it was justified in doing so because of its "qualities and characteristics" and "the circumstances of the particular case."[16]  Although a creditor is not entitled to "blindly rely" on a patently false statement, it is justified in relying on a representation of fact even if it "might have ascertained the falsity of the representation had [it] made an investigation."  *In re Sharp*, 340 F. App'x at 906-07 (internal quotation marks omitted) (*citing Field*, 516 U.S. at 70-71).  Reliance is a factual issue, and the bankruptcy court's finding will not be set aside unless clearly erroneous.  *Id.* at 906.

---

[16] *Sharp v. Sharp (In re Sharp)*, 340 F. App'x 899, 906 (4th Cir. 2009) (internal quotation marks omitted), *citing Field v. Mans*, 516 U.S. 59, 68 (1995).

Marinucci argues that SG Homes relied on neither his promise to obtain a payment bond, nor false certifications in the payment applications. ECF No. 3 at 17.

i.   Misrepresentations About the Bond

Marinucci contends that SG Homes could not have relied on his promise to obtain a payment bond because it drafted and executed the Contract, which did not require a bond.[17]  He argues that any post-Contract failure to correct false statements was not fraud, and SG Homes waived any right to require a bond by allowing Chesapeake to work for months without obtaining a bond. ECF No. 3 at 25-28.

SG Homes counters that, until May 12, 2008, the terms of the parties' agreement were governed by all their communications, which established that a bond was required.  ECF No. 20 at 25-26.  After the Contract was executed, SG Homes exercised its right to demand a bond, and Marinucci allowed Munnikhuysen to falsely represent that Chesapeake would "get on the bond right away."  *Id.* at 26.  SG Homes argues that Randall showed reliance by testifying that, had he known Chesapeake was not going to obtain a bond, SG Homes would not have awarded Chesapeake the job, or would have taken other steps to avoid "pay[ing] twice for the same work and materials."  *Id.* at 27.

---

[17] ECF No. 3 at 19-23.  He argues that any ambiguity in the Contract must be construed against SG Homes as the party that drafted the agreement.  ECF No. 3 at 23-24.

The Court finds ample evidence of reliance to support the conclusion that Marinucci committed fraud by lying about his efforts to obtain a bond.  Randall testified that, had he known in January or February 2008 that Chesapeake would not obtain a bond, SG Homes would not have awarded the contract to Chesapeake or allowed it to start work.  Lorin Randall Test., Trial Tr. 61:15-24, July 14, 2011.  He also testified that, had he known after executing the Contract that Chesapeake would not obtain a bond, SG Homes would have paid the subcontractors and suppliers directly, or worked out an agreement with Chesapeake to issue joint checks.  *Id.* at 57:4-18.  From this testimony, the bankruptcy court reasonably concluded that SG Homes had actually relied on Marinucci's false statements about the bonds.[18]

ii.  False Certifications

Marinucci also contests the bankruptcy court's finding of fraud on the basis of false certifications in the payment applications.  ECF No. 3 at 28-30.  He contends that the

---

[18] The Court rejects Marinucci's argument that SG Homes waived the bond requirement by allowing Chesapeake to begin work without a bond, and drafting a contract that did not require a bond.  *See* ECF No. 3 at 27-28.  Because SG Homes did not know that Marinucci was lying when he promised that Chesapeake would get a bond, SG Homes did not intentionally relinquish its right to the bond by allowing work to begin.  *See Hovnian Land Inv. Grp., LLC*, 25 A.3d at 983.  Moreover, the Contract allowed SG Homes to require a bond "at any time," even if a bond had not been required at the outset.  *See* Pl.'s Ex. 5 at 6.  Thus, SG Homes did not relinquish its right to a bond when it drafted the Contract.

applications required Chesapeake to certify only that it used SG
Homes's money to pay Chesapeake subcontractors and suppliers,
not that it used the money to pay only vendors providing
supplies or services to the Crabbs Branch Way project. *Id.* at
28-29.  SG Homes argues that Marinucci ignores the parties'
intent and the plain language of the Contract, which the Court
must read in conjunction with the certifications.  ECF No. 20 at
28-30.

"[W]here a writing refers to another document, that other
document, or so much of it as is referred to, is to be
interpreted as part of the writing.[19]  The certifications in the
applications stated that SG Homes's payments to Chesapeake had
been made "in accordance with the Contract Documents," and "all
amounts previously paid to [Chesapeake] under the Contract ha[d]
been used to pay [Chesapeake's] costs for labor, materials, and
other obligations."  *See* Pl.'s Ex. 31A at 1.  Thus, the Court
must read the certifications and the Contract together.

The certifications required Chesapeake to use the money
from SG Homes to pay only the subcontractors and suppliers
working on the Crabbs Branch Way project.  The Contract provided
that Chesapeake had to pay all subcontractors and suppliers "all
amounts due *in connection with the performance of the Contract.*"

---

[19] *Ray v. William G. Eurice & Bros., Inc.*, 93 A.2d 272, 279 (Md.
1952) (*cited in Wells v. Chevy Chase Bank, F.S.B.*, 832 A.2d 812,
831 (Md. 2003)).

*See* Pl.'s Ex. 5 at 2 (emphasis added).  Moreover, Marinucci
understood that, when SG Homes paid Chesapeake, Chesapeake was
to use that money to pay the subcontractors who worked on the
Crabbs Branch Way project.  *See* Michael Marinucci Test., Trial
Tr. 128:12-23, July 13, 2011.  Indeed, Chesapeake's contracts
with its subcontractors and suppliers promised payment only
after it received money from SG Homes.  *See id.* at 103:3-106:1.
In addition, the Contract incorporated the Maryland Construction
Trust Statute,[20] which required Chesapeake to use money it
received under the Contract to pay only the subcontractors and
suppliers that had worked on the Crabbs Branch Way project.  *See*
Md. Code Ann., Real Prop. § 9-201.

    Accordingly, the Court will uphold the bankruptcy court's
findings that SG Homes relied on Marinucci's false promises to
obtain a bond, and his false certifications in the payment
applications.

        b. Damages

    A fraud plaintiff objecting to the discharge of debt in
bankruptcy must also show that the defendant's misrepresentation
proximately caused the plaintiff's damages.  *In re Sharp*, 340 F.

---

[20] *See Hearn v. Hearn*, 936 A.2d 400, 406 (Md. Ct. Spec. App.
2007) ("Parties to a contract are presumed to contract mindful
of the existing law, and all applicable or relevant laws must be
read into the agreement of the parties just as if expressly
provided by them, except where a contrary intention is
evident.").

App'x at 901.  Under Maryland law, a fraud victim may recover

its out-of-pocket expenses.[21]  "A court's calculation of damages

is a finding of fact and therefore is reviewable only for clear

error, but to the extent those calculations were influenced by

legal error, review is *de novo*."[22]

Assuming that SG Homes could recover only the benefit of

its bargain,[23] Marinucci argues that it did not incur damages of

$208,806.89 when it directly paid Chesapeake's subcontractors

and suppliers.  ECF No. 3 at 32-33.  He contends that SG Homes

owed Chesapeake $277,000, and "SG Homes's decision . . . to

instead use that money to pay Chesapeake's subcontractors and

suppliers, does not translate into SG Homes suffering any

damages."  *Id.* at 34.

SG Homes counters that (1) Marinucci stipulated that SG

---

[21] *Goldstein v. Miles*, 859 A.2d 313, 324 (Md. Ct. Spec. App.
2004) (internal quotation marks omitted).  Alternatively, a
fraud victim may seek "benefit-of-the-bargain damages," which
"put[] the defrauded party in the same financial position as if
the fraudulent representations had in fact been true." *Id.* SG
Homes recovered out-of-pocket expenses.

[22] *Universal Furniture Int'l, Inc. v. Collezione Europa USA,
Inc.*, 618 F.3d 417, 427 (4th Cir. 2010) (internal citation and
quotation marks omitted).

[23] *See* ECF No. 3 at 31 ("The starting point for this analysis is
the measure of damages for a breach of contract . . . . This
measure of damages has also been referred to as the "benefit of
the bargain measure[.]"").  Elsewhere in his opening brief,
Marinucci appears to conflate the two measures of damages.  *See
id.* at 37 ("The way to calculate the 'out of pocket' or 'benefit
of the bargain' losses in this case is actually quite simple.").

Homes paid $208,806.89 to the subcontractors and suppliers, (2) Randall explained in detail how he arrived at that figure, and (3) Marinucci's testimony that SG Homes owed Chesapeake $277,000 is unsupported by the evidence.  ECF No. 20 at 31-33.

As a preliminary matter, the Court finds that no legal error influenced the bankruptcy court's damages calculation. Contrary to Marinucci's contention, SG Homes was entitled to recover its out-of-pocket expenses rather than benefit-of-the-bargain damages.  *See Goldstein*, 859 A.2d at 324.  Thus, the Court will review the bankruptcy court's damages calculation for clear error.  *See Universal Furniture Int'l, Inc.*, 618 F.3d at 427.

The Court finds no error in that determination.  The evidence before the bankruptcy court included the party's stipulation that SG Homes had paid the subcontractors and suppliers $208,806.89, Randall's testimony about how he calculated that figure, and Chesapeake's spreadsheet showing that it still owed more than $534,000 to vendors in November 2008.[24]  The bankruptcy court was free to give more weight to this evidence than the testimony of Marinucci,[25] who conceded

---

[24] *See* Trial Tr. 131:12-132:20, July 13, 2011; Lorin Randall Test., Trial Tr. 115:15-119:22, July 14, 2011; Pl.'s Ex. 52.

[25] "[A]ssessing the weight of the evidence and the credibility of witnesses is within the sole province of the fact-finder."

that he had not reviewed the invoices used in Randall's
calculations, and provided no documentary support for his
assertion that Chesapeake was owed $277,000.[26]  Accordingly, the
Court will affirm the bankruptcy court's finding of fraud and
entry of non-dischargeable judgment for SG Homes.

C. SG Homes's Cross Appeal

SG Homes argues that the bankruptcy court erred in
dismissing the original claim under 11 U.S.C. § 523(a)(4), which
disallows discharge of a debt "for fraud or defalcation while
acting in a fiduciary capacity."  ECF No. 20 at 36.  SG Homes
concedes, however, that the alleged error "will have no adverse
consequence" if the Court affirms the judgment in its favor.
*See* ECF No. 20 at 41.  Because the Court will affirm the
judgment for the reasons stated above, it need not address the
merits of SG Homes's cross appeal.[27]

_____

*Parris v. Lynch*, 35 F.3d 556 (table), 1994 WL 486549, at *1 (4th
Cir. 1994).

[26] Michael Marinucci Test., Trial Tr. 122:12-21, 125:15-126:2,
July 14, 2011.  Had the bankruptcy court believed Marinucci, it
would not have erred in accepting SG Homes's damages calcula-
tion: $277,000 would not have satisfied the more than $534,000
in unpaid invoices.  *See* Pl.'s Ex. 52.

[27] *See, e.g.*, *Lee v. Lockheed Martin Operations Support, Inc.*,
203 F. App'x 505, 507 (4th Cir. 2006) (per curiam) (affirming
the judgment of the lower court and, thus, finding "no occasion
to address the claim presented in [the] cross-appeal); *Handley
v. Union Carbide Corp.*, 804 F.2d 265, 271 n.23 (4th Cir. 1986)
(declining to consider alleged errors raised in the cross
appeal, because they did not affect the lower court's judgment

III. Conclusion

For the reasons discussed above, the bankruptcy court will be affirmed.

_____      _____
4/4/12
Date                            William D. Quarles, Jr.
                                United States District Judge

---

for the cross appellant, which was affirmed). *Cf. Troy v. City of Hampton*, 756 F.2d 1000, 1010 (4th Cir. 1985) ("[W]here an error below does not prejudice the substantial rights of the parties, an appellate court must find that the error was harmless and refuse to reverse and remand."); *Stevens v. Showalter*, 458 B.R. 852, 857 (D. Md. 2011) (finding that, "even if the Bankruptcy Court erred . . ., any such error was harmless since [the appellant] suffered no prejudice as a result").